Good morning, Your Honors. My name is Jay Zuloff, and I'm here on behalf of the trustee in bankruptcy, Mr. Robert Steinberg, and on behalf of Shire Equipment Leasing, Inc. I apologize, I lost part of my voice somewhere along the way, so if you need me to speak up, let me know. We will do that. Let me give you an idea of my argument. I'm going to make five major points if I have enough time. There's a lot of material here, as you know. My first point is going to be on the bankruptcy law, and I'm going to give that some focus. Essentially, it's my argument that the bankruptcy law prevents the court from taking the $20 million merger consideration and giving it to the plaintiffs. I'll talk about the bankruptcy law. My second point is that the court improperly voided the 1997 stock subscription agreement and improperly rescinded that agreement. The third argument is that the court misapplied the remedy for rescission. The court said it was going to try and put the parties back where they originally were pre-agreement, but they did not accomplish that because they didn't reinstate the claims under the 1996 agreement. I assume you'll talk about this when you get to it, but can you address the statute of limitation problem under Idaho law with regard to that last point? Just work it into your argument. You don't have to do it now. The fourth point is that the district court, by forcing a pretrial election of remedies, deprived the defendants of their right to a jury trial. It should have been done post-trial but pre-judgment. And finally, that the alternative findings that were entered do not support a decision to transfer the ownership of the $20 million back to the plaintiffs. So with that outline, let me talk briefly about the bankruptcy law. I will try to talk about 15 minutes to save about five minutes for rebuttal, if that's okay. You can see the digital that controls over your watch. Okay. I will yield to that. And if you go over, we'll forfeit your watch. I'm not sure that's a great law. It's an amazing subscription. Under the authorities we've submitted, including Betacom and Section 510 of the Bankruptcy Code, a couple points can be made about the bankruptcy law here. One is that someone who's an investor, like the plaintiff here, ITIG, and who signs up to buy stock of a company and then doesn't get it or feels defrauded, is in a unique situation under the bankruptcy law. First, they're relegated to the status of an unsecured creditor. But more than that, the bankruptcy law says that they are demoted. They are mandatorily subordinated to a position where they are essentially last in line. It's our contention that applies to ITIG here. They come after all the other creditors. And the second basic proposition I get from those cases is that when an investor tries to do what I call an end around, the courts have not allowed that. And repeatedly, somebody who's an investor tries to avoid the applications law by saying such things as, well, I'm really not making the securities claim, or the transaction really didn't close. And the courts have said, no, if it relates to your status as an investor, you are back in there as an unsecured creditor and you are subordinated. And when they've tried other arguments, they say, well, gee, I'm not just asking for damages, which might subordinate me. I want to do a rescission. The courts have said, no, you can't do an end around. And the cases talk about a whole bunch of different tactics that have been tried, including claims for specific performance, declaratory judgment, a constructive trust. It's really my money, but it's in a trust, even tortious interference. I'm with you, except that you've got a premise there that I'm having a hard time with, and that is that this was an actual investor. And that then raises the question of the closure of the contract. Okay. And if the investment was never finalized, then what does that do to your argument? Okay. I would say that when you read the cases, there are cases there where the transaction is not finalized, where somebody signed up for a sign. They didn't get it. There was a bankruptcy before that. And the courts have said, in that instance, whether you actually get the stock, whether it's actually closed, it's still a situation where 510 applies. But did that case involve a cash for stock? I mean, we've got a stock for stock, and that complicates things, does it not? True. But the consideration that was rendered was the gondola stock. I'll jump ahead here a second. Well, but the question is whether or not the title transfer. You are exactly right. I mean, this is a unique animal. You are right. You're right. And that's what I'm going to come to, because when you go through all of this approach, we've had a lot of different positions from the plaintiffs. But I think where they end up is they're saying, we're not claiming we're a creditor now. We're not claiming we're a secured creditor. We're not seeking any distribution. And I think they can do that. They don't have to come in and make a claim against the bankruptcy estate. But can they do an end around? And I think the law is no. And so their theory is this. You call it an end around, but if they're not in the bankruptcy proceeding, then they may not be making an end run here. They may be simply saying, we never relinquished control over the consideration that we had promised. And all we really wanted is a declaratory judgment that what's ours is ours and was never part of the bankruptcy estate. Isn't that what this page boils down to? I think that's right. I think the law is as I said it is. It's a question of whether that law applies. And that turns on who owns the stock. Right. Okay. We're together then. The critical question is who owned that Gungel stock on September 18, 2000, when the bankruptcy was filed. And it's our position that if you look at the law, you look at the circumstances at that time, that Pro Air owned the stock at that date. Principally because of UCC 62A-8, which is the Uniform Code specifically addressing this kind of question. If the stock's in transit, who owns what rights and when? And that law basically says that the delivery occurs upon possession, that the transfers complete upon delivery, and the recipient receives all rights of the transferor. And that's the black letter law that we believe applies here. Now, if one goes further and looks at the stock subscription agreement, one can look to see is there any language in there that is property language that purports to retain property rights. It says these rights are not transferred. And one looks in vain for any argument like that. It could be argument language in there that says Pro Air's a bailee, or Pro Air's our fiduciary, or Pro Air's our trustee, and address that situation and make it recognizable that property rights were retained. There's no such language in there. And indeed, Judge Lasnik in his decision said that basically that before they entered into the 1997 agreement, ITIG had full ownership rights. The implication is that after they entered into the agreement and transferred the stock, they lost it, and that's why the judge had to render precision to try and change that. So it's our belief that the stock is a part of the bankruptcy estate. If ITIG wants to pursue that, they have to do that through this mechanism, and they're subject to the mandatory subordination rules. Now, they have tried one other thing. They've tried to say, look, we sell on the stock power, and that changes things. Well, a couple things. You look at the stock power, and it doesn't talk in terms of reserving property rights. And moreover, the stock power wasn't transferred with the share certificate. The share certificate was transferred in May, according to the record in the judge's decision. That stock power is dated June 5. And so it's later on, and it wasn't transferred at the same time. I would argue it's not consistent with the terms of the stock subscription agreement, which says essentially that Pro Air is supposed to get the stock certificate in its name. It's supposed to have it outright. Or alternatively, you can give them the essential equivalent by giving them that stock certificate with appropriate transfers. When ITIG tried to do this stock power thing, they were trying to limit it so they could block it through a transfer agent, and that was in violation of the agreement. The agreement didn't permit that. It did one other thing, too. It tells you something about the motivation here. You've got an investor who's going to put up $5 million in a brand-new airline, or $5 million of the stock equivalent in a brand-new airline, and that airline may fail, or it may succeed. If it succeeds, it can have a situation where the stock goes from $5 to $500. And if that's true, ITIG stands to have $500 million. By doing this, by trying to put the stock power in, they essentially gave themselves an option either way. If it succeeded, they could say, oh, yeah, word of the investor. I think what you're saying is that they hedged their bet in a way that basically was a win-win for them, because if it didn't look like the startup company was going to succeed, then by virtue of the manner in which they had orchestrated the tender, I'll use that term, of the stock, they still had control over it and they could pull it back, whereas if it succeeded, they'd be happy to let $5 million go and get $20 million back. Exactly. But your argument basically is that they're not entitled to equitable remedies because their hands are unclean. Well, there's certainly that element. That's their motivation. But what do you do with the district court's finding that the debtor itself, Mr. Stamper, former president of Pro Air, also exercised bad faith in the manner in which he terminated the private investment before any funds were raised? Okay. Well, we've all dealt with alternate findings. When a court makes a ruling, kind of one theory, and then they put in alternate findings. When I read those findings, I see things like Mr. Stamper signed his son's name. Mr. Stamper didn't give full disclosure about the difficulties they were having in the offering. Mr. Stamper didn't report correctly exactly what money was raised. And those are findings of fact which we must defer to, absent a determination that they're clearly erroneous. Yeah, I think that's right. Unless they should have been found by a jury. Well, that's another one of my point four. I would say that those items, if you look at them, are not material. They don't justify a rescission. If Kevin Stamper signed his son's name, what difference does that make here to IG&G? Indeed, they might have benefited because it was part of Kevin's effort to get this airline going, to get more money. Or if he didn't report exactly the status of the offering, did that make any difference? There's no showing that it made any difference. Well, the district court found it was material. I know, I know, I know. And I think you have to address that and say when you look at those facts carefully, do they in fact make a material difference to ITIG? But I'll come back to this. Well, your time is running down. So if I could just get you to focus. You used the word rescission several times. The court uses it. The contract uses it. Now, what I'm trying to understand is there seems to be no challenge, no appeal from the district court's finding that the contract, the 1997 contract, didn't contemplate that no money would be raised. There is a rescission provision in the contract that says the contract may be rescinded. Now, it's a funny use of the term rescission because it doesn't really rescind the contract. What it does is has three alternatives on amount of money raised and then imposes obligations on ITIG as to how much of the stock it has to deal with. But it doesn't rescind the contract and put everybody back to square one. It has contingencies. Now, what in the district court's opinion, it rescinded the contract by voiding it, and then the question is what happens to the parties in that construct. And that's what I'm having trouble here about the term rescission. He finds bad faith. He then rescinds, the court rescinds the contract as an alternative holding and apparently voids the entire contract and saying they get all the stock back. So what's your position on what the remedy is here, assuming that there was or wasn't a breach by ITIG or a breach by Pro Air? We are challenging the decision. We think the court was in error to void the contract. We think the court was in error to try and invoke a rescission remedy. Well, do you agree that the contract was voidable or rescindable because it didn't provide for the provision of no money being raised? No, Your Honor. I don't see where that's been appealed from, that aspect of the decision. Well, we've challenged that decision all the way through, the void and we've argued the contract. Let me tell you what I see in this contract because I think that may help here. I see a contract where it's simply a purchase of stock for consideration. It happened to be Gundel stock as consideration. But then some bells and whistles were added. And one of those bells and whistles was Paragraph 5, which said if certain things happen, then there can be a rescission. And the court looked at that and saw the word closing and said, we're going to take closing to mean a consummation. And I say, okay, that's fine if we're going to do that. Apply the word consummation to Paragraph 5 and what happens? If no money is raised, then there's no right of rescission. It's a simple little provision. It's easy to apply. It doesn't affect the validity of the rest of the contract, and it doesn't warrant avoiding the contract. And I think anyone looking at it, it's a matter of law, looks at that and says. . . Run that by me again. If there's no money raised. . . If no money is raised, if you have to have a consummation. . . Correct. And there is no consummation and no money is raised, then there's no right of rescission on the part of our client. But if they raise a dollar. . . But if that's. . . Yes, that's one important point. If they raise a dollar, then they've got some rescission rights. You don't have to throw out the whole contract. I think that's a logical comment. No, and that's my second point. I think the first point is that the contract language is clear. You can read it. You can look at the objective manifestation, and the parties intended that there would be a rescission only if there was a closing and the court defined it. Why don't you read 5C as simply saying if zero dollars are raised, which is less than $10 million, then 5C applies. Okay, and that's been one of our arguments all along. That goes to the next argument. Well, I thought you just said if zero dollars were raised, then none of these applies. There are no rescission rights if there's zero dollars raised. Well, 5C says these rescission rights are as follows, and C is if Pro Air closes, having raised less than $10 million in proceeds, zero. I need zero. Okay, then that rescission right applies. Right? That's what it says. That's what happens. Hold on just a second. There are consequences that flow, not that nothing happens. Okay, you get that. But that one, if there's some money in between there, some money is raised, they have rescission rights. But if zero is raised, then according to the court's theory, this issue is not addressed. Let me touch on the second part of this. The judge found out, decided that closing means consummation, not the end of an operation. And we all know that the term close is used by us to mean sometimes the end of an activity, like we close our recruiting season at the law firm means the end. And if you look at the word that way, it makes sense. The contract works. The way the judge has construed it, you end up with a situation where if there are multiple closings, you have to have multiple consummations. If there are multiple consummations, it may be that none of them totals $15 million. But isn't the closing that the district court was contemplating, doesn't it mean simply the end of the raising of funds pursuant to the private placement offering? That's what we think. There's only one closing. That's what we think. And your client, or your successor to the client, Mr. Stamper, basically closed the effort at a point where nothing had been raised. That's right. He ended it at that point. That's what the contract provides. What happens then? What's the legal import of that? It means that IG simply has no rescission rights. That's the clear manifestation of the parties. So your position is that upon close, as you've defined it, if $0 have been raised, then they don't have any of the options set forth in Paragraph 5. That's right. But the rest of the contract goes to the district. I just want to make sure. And then what happens to the stock? It stays with Chai. If they are absolutely unsuccessful, then ITIG loses all of that stock. But if they raise $1, then they have $1 million. Then they can invoke the rescission rights. When you think about that, that makes sense. I'll have to think a long time about that. Well, that's fair enough. Let me say this. If a proprietor is unable to raise the money that it needs as working capital, then it doesn't want to have ITIG in a position of rescinding because they don't they lose that chance working capital. This is designed to keep them funded. But the district court found a breach of the implied covenant of good faith and fair dealing in the manner in which Mr. Stamper executed his obligations under the contract and voided it for that reason. Why is that error? Well, first of all, because it's trumped by the bankruptcy law that we talked about. And second, I don't think there's any showing that that's material or prejudicial to ITIG. And it certainly doesn't warrant saying that it goes to the essence of the contract and you have to void the whole contract. Give them some damages, they can have an adjustment if there's been a breach, but it doesn't warrant throwing out the whole contract. Okay, you have run your time down. I don't want to forfeit your watch, so I'll leave you that amount of money or that amount of time, and we'll hear from the other side. Good morning. May it please the court. My name is Christopher Alston. At the table with me is Jane Pearson, my partner. Behind her is Marco Mignano, my partner. And next to him is my client, Representative Samir Badawi. And we're here on behalf of the respondents, formulae limited and ITIG. And you think there's safety in numbers, huh? I certainly hope so. I certainly hope so. I'll start right in with the bankruptcy law causes of action that were belatedly asserted in this litigation. The defendants claim that the district court erred by rendering a declaratory judgment in favor of my clients in spite of these bankruptcy law causes of action. But what they ignore is that the bankruptcy court, prior to the withdrawal of the reference, entered an order which precluded every single one of these bankruptcy law causes of action. These bankruptcy law causes of action are premised on the notion that the plaintiffs have a claim for a distribution in this bankruptcy case. Now, subordination under Section 510B applies only to creditors who seek payment on claims. The statute begins with a language, for purposes of distribution. And in the Washington Bank Corporation case that the defendants rely upon, the court there refused to apply Section 510B precisely because the creditor was not asserting a claim for damages arising from the purchase or sale of securities. So prior to the withdrawal of the reference of this case, the defendants filed a jury demand, and we filed a motion to strike the jury demand, and there was substantial briefing and litigation over that matter. The bankruptcy court noted that litigants do not have a right to a jury trial in actions concerning the allowance or disallowance of claims in a bankruptcy proceeding. Now, we argued, and admittedly we argued very vigorously, that we did have a claim for a distribution and that our complaint invoked a claims allowance process and that the defendants' breach of contract counterclaims of the trustee were in essence an objection to our claim for a distribution, meaning that there would be no jury trial. The defendants argued the opposite. They said very clearly that we do not have a claim in the bankruptcy case and our complaint did not invoke the claims allowance process, and simply put, we lost and the defendants won. And the import of that is the defendants were able to preserve their jury trial. Judge Overstreet, in her order denying our motion to strike the jury demand, concluded, quote, the plaintiffs are not fighting for a distribution pro rata with other creditors in this bankruptcy case. They are fighting to have a piece of property that only they have the alternative right to have. Either they have it or the debtor has it. Close quote. The bankruptcy court went on to say, so if I look at the remedy that is being sought and I ask the question, does this complaint invoke the claims allowance process, I conclude that it does not because there is no scenario in this lawsuit under which the plaintiffs become creditors in this bankruptcy. They are not seeking monetary damages against this debtor. Consequently, the law of this case is that the relief that my clients are seeking is not money damages. We are not asserting a claim for distribution in the bankruptcy and instead our only goal is to prove our exclusive right to the Gundle shares. It is plain that section 510B, which applies only to creditors seeking distributions, has no application to the plaintiffs in this case. I can certainly understand from an economic standpoint why you would take that litigating position. Why get in line with the other creditors if you can get $20 million worth of stock outside of the bankruptcy estate? The question is whether or not Judge Overstreet, I suppose, was correct in her findings and whether or not that ruling is subsumed within the issues that the appellants have raised here on appeal. That's a very good question. The appellants are not asking you to reverse that order because that would deny them their right to a jury trial. It was that very order that gave them the basis for getting their jury trial. So they are clearly not asking you and don't want you to reverse that order. We would also argue under the First Circuit decision of Brandt v. Wan Partners that this court does not have the jurisdiction to have a direct review of a bankruptcy court order. There needs to be an appeal first to either the district court or the bankruptcy appellate panel, which they didn't do. And clearly, even more simply, it's not been charged that there was error in that decision. So it's not being appealed. The defendants don't want you to reverse it, and so we would ask that you not. So we don't need to reach the question of whether Judge Overstreet got it wrong. At least that's our view, and therefore that's the law of the case and the bankruptcy law causes of action simply just go away. With respect, then, to the next set of arguments that I think really relate to the contract itself, and I think that the questions from the panel indicate how confusing this contract was, and that's precisely why Judge Lasnik at the end said clearly there was not a meeting of the minds with respect to this real one critical unforeseen circumstance. What happened if the private placement failed? And there was a lot of discussion about closing. What did closing mean? What was the good faith obligations of the parties under the agreement? And ultimately, Judge Lasnik concluded that the parties just didn't understand or didn't reach agreement on what would happen if the private placement raised zero. But Mr. Zuloff's response to that is that's not a true mutual mistake of fact as a matter of black-letter contract law. The fact that the parties didn't foresee this particular event doesn't necessarily mean that when they entered into the contract there was a mutual mistake of fact, does it? Well, I think that the response there is that the parties didn't understand or didn't have a mutual agreement, in other words, a meeting of the minds on what the closing was going to do, what was going to happen under the closing. Our clients testified that they understood the closing was going to raise something substantially more than zero. Mr. Badawi, in his letter of March 1998, said they understood that it was going to raise a minimum of $3 million. Now, it's not in the contract, I understand, but there was evidence and testimony at trial that indicated that that was the understanding of ITIG, that this was going to raise at least $3 million. If zero was acceptable, you have to ask the question, why was Mr. Stamper going out of his way to hide the fact that the private placement had utterly failed? He repeatedly told my client the private placement raised less than $10 million. It was only after repeatedly being asked. That's true. It did. Zero is less than $10 million. Zero is a number. Apparently not. We're being told that the contract says less than $10 million doesn't cover zero. Well, it doesn't cover zero. Do you agree that paragraph 5C does not deal with the circumstance of zero? So less than $10 million is not zero. That's correct. That's our understanding, that if the private placement raised zero, then our clients understood that they had no obligations to go forward. That was their understanding. Their understanding is that you had no way of rescinding because you hadn't dealt with that situation. Who prepared this contract? I know Mr. Stamper authored it, but it went back and forth. It was mutual. It was mutual. Parties had an opportunity to revise it. So the language obviously is problematic. The whole idea of using the word rescission in the middle of the contract is sort of odd, to say the least, but that's how it was drafted. And because of literally the two ships passing in the night that Judge Lasnik found with the testimony of Mr. Stamper versus the testimony of Mr. Batawi, what did they understand was going to happen with this private placement? There was an understanding that the parties were going to, that Pro Air was going to actually go out and raise substantially more than zero. And, in fact, that was necessary because there would have been, for an ownership problem, if ITIG put in another $5 million and no other money was raised, there would have been more than a 25 percent ownership of the airline by a foreign entity, and that was a substantial concern that the parties had, and that's in the record as well. So what we have there is these two parties not understanding a critical fact of what might have happened in the event that the private placement failed. So, accordingly, Judge Lasnik correctly found that this contract should be voided, and it's appropriate to void the contract and put the parties back to where they were, for the obvious reason that the shares, if they don't belong to Pro Air, they need to go back to ITIG and Wembley. And what the defendants would ignore throughout their briefing and their argument is that Pro Air, in fact, received $10 million in loans by pledging the Gundle shares over a several-year period, shares that they technically did not own, ultimately concluded by Judge Lasnik. So they received a substantial amount of money, $10 million that they were able to use, and apparently it wasn't sufficient, but they ended up where they are today. I will next then address the issue of the statute of limitations, and I know the panel is interested in that and we didn't hear much, but on the 1996 agreement that was found to have been replaced by the 1997 agreement, again, Judge Overstreet already entered an order before the bankruptcy court, before the reference was withdrawn, in which she found that the 1996 agreement was replaced by the 1997 agreement, and she found that whether or not the 1996 agreement was revived is irrelevant. She concluded that the statute of limitations continued to run from that time when Pro Air first determined that it had a cause of action, which the court found was no later than November 1996, and the five years had run by the time this litigation had began. What we hear now, the litigation began in October of 2002, so what we hear now from the defendants is essentially an equitable tolling argument, something that's, again, somewhat new and wasn't really addressed below, wasn't addressed by the district court, and that's the first issue I would raise, is that this matter should have been brought before the district court first, and I think the Brandt v. Wan partners case out of the First Circuit is very illustrative of the situation and what we should follow in today. If Pro Air had sought to appeal, sought an interlocutory appeal of Judge Overstreet's order to Judge Lasnik before we had our trial, Judge Lasnik could have decided, yes, let's have an appeal of that issue, and I'll rule on that now, and if the bankruptcy court was reversed, we could have tried all the issues at the same time, and instead they waited. They had a trial. We didn't have a trial over the 1996 issues, and now they want to go back and have litigation over the 1996 alleged breach of contract claims, and that's precisely the sort of piecemeal litigation that Brandt v. Wan partners says we should try to avoid. If, as the First Circuit noted, the defendants had said to Judge Lasnik, we would like an interlocutory appeal so we can get all issues before you before trial, more than likely Judge Lasnik would have granted the interlocutory appeal and either upheld or reversed Judge Overstreet's order. So we would say, first of all, that this court does not have direct jurisdiction to be able to hear the order from the bankruptcy court directly for the reasons we discussed earlier, but even more importantly, the notion of equitable tolling wasn't addressed down below. We weren't given an opportunity to put on evidence with respect to the issue, and they should not be allowed to come up to this court for the first time and ask the court to reverse on the issue of equitable tolling without having given us an opportunity to litigate the issue below. But more importantly, if you look at the 1997 agreement, it does not say that any claims are being released, that any claims are being waived, that any claims are being foregoing any claims whatsoever. It's just merely a replacement of the 1996 agreement. I'm not sure how that helps you then. It seems like if it was void for lack of meeting of the minds, then you revert back to 1996. Here's how we think it helps us. If they want to argue that Pro Air had no right to bring a cause of action while the 1997 agreement was in existence, that's what they would need to say in order to prevail on equitable tolling. If you look at the 1997 agreement, though, it doesn't prevent them from bringing claims under the 1996 agreement. There's nothing in there that says they can't assert their claims. And Mr. Stamper testified that he was well aware that he had causes of action, but he decided that Pro Air's hands were just too full to bring them at the time. So there was nothing in the 1997 agreement that prohibited them from bringing their claims during that time. They could have brought them at any time and chose not to. They didn't, and, therefore, they should have those claims. Basically, overstreet's ruling dismissing those claims on summary judgment should be upheld. What does paragraph 7? I'm not going to quarrel with your characterization, but I just 7A of the 1997 agreement says, This agreement constitutes the understanding of the parties concerning all matters relating to, herein, and replaces and supersedes the prior agreements of the parties with respect to the $5 million in support of Pro Air's private placement by ITIG. So you're saying that it superseded, but it didn't waive any claims. Therefore, they could have gone ahead, sued for breach under the 1996 agreement. You would not have invoked 7A as a release or a court in satisfaction or any of those things. That's what that's what. That's easy to say now. That's right. As I sit here today, we certainly would not have. And if you look at that language, again, it says it supersedes and replaces. Mr. Stamper's an attorney. He could have put in release language. He would have understood the import of putting in release language. Then they might have an argument that they were prohibited from bringing claims from May of 1997 until the 1997 agreement was voided. But they can't make that argument, and therefore the claims should have been dismissed. We've not talked much about the jury trial. And that, I understood, was their most important argument, at least in the briefing. So I would like to address that. I think the most obvious problem with their argument is that they were given an option for a jury trial. If you read Judge Lasnik's order, it's actually the question is whether they have to elect remedies at that stage. They were seeking damages or specific performance. Those aren't inconsistent remedies. The remedies aren't inconsistent. The facts that supported each of those remedies are inconsistent. In order to have proven specific performance, the defendants were required to show that Pro Air was entitled to receive the Gundle shares, would have kept the Gundle shares from 1998 until the time of trial, and that money damages were not an adequate remedy. In order to obtain money damages, the defendants were required to show that Pro Air wanted to sell the Gundle shares, could not sell them because of plaintiff's breach, would have, in fact, sold the Gundle shares, and received some amount of money, something around the range of $5 million in 1998, and then would have used that amount as working capital to generate profits. So the facts are very different. Under one set of facts, they would have been arguing they needed to keep the Gundle shares in order to retain the current, the appreciated $20 million value. But on the other hand, for money damages, they conclusively needed to prove that these shares would have been sold to generate working capital. So Judge Lasnik said, well, these are completely different. You can't prove both. And by putting both in, you're likely going to confuse the jury and prejudice the plaintiffs. The prejudice would be if the defendants put on evidence of the $200 million of alleged lost profits, but then also threw in the $20 million current value of the shares, the jury would be confused and might just choose some number as a compromise, something between $20 million and $200 million. Judge Lasnik wasn't going to allow that. Judge Lasnik also said, look, if you're not going to seek damages and you're only going to want the specific performance remedy, let's not waste the time of impaneling a jury. Let's not waste the party's time of preparing experts and preparing for a jury trial. If, in fact, you're then going to abandon your damages claim at the end of your case. And I think the cases, none of them prohibit the election of remedies prior to trial. It's disfavored, understandably. But I would think that actually Judge Lasnik's order isn't really an election of remedies order. I think it's really more fairly characterized as an order limiting the evidence, saying you're not, we want you to decide in advance which case you're going to put on. You can't put on both cases, just tell us in advance so I can manage my trial docket and I can save the time and effort of the parties of unnecessarily preparing for a jury trial. There are limits to what a judge can do, though, to manage docket to force a plaintiff out of their right to a jury trial. That's very true. And we would say that even if Judge Lasnik was incorrect, the error was harmless because the defendants had the right to a jury trial. Nothing in Judge Lasnik's order precluded them from bringing their jury trial and could have done so. So the question to ask back to the defendants is, why didn't you bring your claims before a jury? When you had a $200 million upside with your damages claim, but only a $20 million upside with respect to your specific performance claim, why did you choose the latter one? And it seems to us that it was a decision that was made in order to preserve what they're doing right now, seeking a second bite at the apple. They would make a run before the district court on the bench trial, and if they won, terrific. If they lost, they're back up here saying, let's appeal the district court's ruling, and let's go back and we want a whole new jury trial on all issues. Well, they should have chosen the jury trial first. Then, if they lost, ask for equitable relief post-trial. If that was denied, come to this court and ask for appropriate relief. And if the equitable relief that was denied, that order is reversed, you can go back to Judge Lasnik without having to have a whole new trial. It was precisely to preserve this ability to get a second bite at the apple, which is why we think they chose this route. But for them, they cannot seriously argue that they were denied their jury trial rights. This panel has any further questions? Thank you. 1.04, okay. Let me make just a couple of points. One is that we believe that Section 5C, where it says, if less than $10,000, does cover the situation of zero. And if I didn't make that clear, I want to let you know that that's for review. 5C gives a partial rescission right, which allows ITIG to rescind any obligation over $5 million. But it keeps the $5 million for Pro Air, which is important for the new company and goes to the essence of this agreement. With regard to the tolling question, it's our belief that the judge, in fashioning a rescission remedy, said the right thing. He wanted to put the parties back where they were. But he didn't get to that point. I think the parties clearly had a transfer of the 1996 agreement. I think it was superseded. And it needs to be reinstated so the parties can proceed. But if it's reinstated, then what's your response to Mr. Alston's argument that you neglected to appeal or chose not to appeal the bankruptcy court's ruling? And Judge Overstreet did find that you were barred by the five-year Idaho statute of limitations. She did say that that's the way it looked to her. I'll phrase it that way. That's her holding. I mean, it's more than it looks like it. I mean, that's what she said. Her holding is that we get to keep our jury. That's the holding. And are we going to appeal a decision that we get to keep a jury? I'd say it's part of the dicta, the discussion that's involved. And at that point, nobody knew what the reformation, whether it be a reformation or rescission, or what the nature of the rescission would be, or what sort of remedy would be applied. And I would say that when that issue comes up before Judge Lasnik, he gets to address all that. And then we're appealing from his decision. Her decision wasn't final. It was interlocutory. There are other grounds that the court can review her decision if need be. But the real problem is Judge Lasnik didn't reinstate the 1996 agreement. We believe he should have. They will then say it's barred by the statute of limitations. And I think it's appropriate for the judge to say, under these circumstances, it's appropriate to have an equitable tolling so that those claims can still be pursued. And that's what we would ask for here. Okay. You're over. I think we have the briefs. I know we have the briefs. Briefs is one of those oxymorons. I think these we've got and we have read. They're all well done, and we appreciate the argument. Very interesting and complicated case. The case is submitted. Thanks to both counsels.
judges: Fisher, Tallman, Ezra